**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
)
LARRY E. KLAYMAN, *et al.*,       )
)
          Plaintiffs,    )
)
          v.        )    No. 13-cv-00851 (RJL)
)    No. 13-cv-00881 (RJL)
BARACK H. OBAMA, President of the    )
  United States,     )
)
          Defendants.    )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE GOVERNMENT DEFENDANTS' MOTION TO DISMISS *KLAYMAN I*
AND *KLAYMAN II* FOR LACK OF SUBJECT MATTER JURISDICTION**

Dated:  November 17, 2016

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Branch Director

JAMES J. GILLIGAN
Special Litigation Counsel

RODNEY PATTON
Senior Counsel

JULIA A. BERMAN
TIMOTHY A. JOHNSON
Trial Attorneys

U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6102
Washington, D.C.  20044
Phone:  (202) 514-3358
Fax:    (202) 616-8470
E-mail:  james.gilligan@usdoj.gov

Counsel for the Government Defendants

## <u>TABLE OF CONTENTS</u>

**PAGE**

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................4

    The Section 215 Bulk Telephony-Metadata Program ......................................................4

    The Discontinued Bulk Internet-Metadata Program Conducted Under
    FISA's Pen/Trap Provision ............................................................................................10

    Targeted "PRISM" Collection of Communications Content Under
    FISA Section 702 ..........................................................................................................11

    Plaintiffs' Claims in *Klayman I* and *Klayman II* ............................................................13

    Proceedings to Date in *Klayman I* and *Klayman II*.......................................................16

ARGUMENT ......................................................................................................................18

I.      LEGAL STANDARDS ................................................................................................18

II.     NO CASE OR CONTROVERSY REMAINS REGARDING THE NOW-
       DISCONTINUED BULK TELEPHONY-METADATA PROGRAM ...........................21

      A.    The Court Lacks Jurisdiction to Hear Plaintiffs' Claims for
           Declaratory and Prospective Injunctive Relief Against the
           Section 215 Program.................................................................................21

      B.    Plaintiffs Also Lack Standing to Seek Expungement of the Remaining
           Bulk Telephony Metadata.........................................................................26

III.    PLAINTIFFS LACK STANDING TO SEEK DECLARATORY AND
       INJUNCTIVE RELIEF AGAINST THE DISCONTINUED BULK
       INTERNET-METADATA PROGRAM. ........................................................................31

IV.    PLAINTIFFS LACK STANDING TO CHALLENGE PRISM COLLECTION ............34

V.     PLAINTIFFS' CONSTITUTIONAL CLAIMS FOR DAMAGES AGAINST
       THE GOVERNMENT DEFENDANTS ARE BARRED BY SOVEREIGN
       IMMUNITY.................................................................................................................38

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

*ABA v. FTC,*
  636 F.3d 641 (D.C. Cir. 2011) .................................................................................. 22, 24

*Afifi v. Lynch,*
  101 F. Supp. 3d 90 (D.D.C. 2015) ................................................................................ 29

*Already, LLC v. Nike, Inc.,*
  133 S. Ct. 721 (2013) ................................................................................................... 24

*Amiri v. Gelman Management Co.,*
  734 F. Supp. 2d 1 (D.D.C. 2010) ................................................................................. 38

*In re Application of the FBI for an Order Requiring the Production of Tangible*
  *Things from [Redacted],* 2013 WL 5741573 (F.I.S.C. Aug. 29, 2013) ..................................... 5, 6

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................................... 38

*Bhd. of Locomotive Eng'rs v. Surface Transp. Bd.,*
  457 F.3d 24 (D.C. Cir. 2006) ....................................................................................... 28

*Burlington N. R.R. Co. v. Surface Transp. Bd.,*
  75 F.3d 685 (D.C. Cir. 1996) ....................................................................................... 24

*Chamber of Commerce v. EPA,*
  642 F.3d 192 (D.C. Cir. 2011) ..................................................................................... 20

*Clapper v. Amnesty Int'l, USA,*
  133 S. Ct. 1138 (2013) ........................................................................................ *passim*

*Clarke v. United States,*
  915 F.2d 699 (D.C. Cir. 1990) .................................................................................. 24-25

*Coal. for Mercury-Free Drugs v. Sebelius,*
  671 F.3d 1275 (D.C. Cir. 2012) ......................................................................... 19, 26, 31

*Coulibaly v. Kerry,*
  --- F. Supp. 3d. ---, 2016 WL 5674821 (D.D.C. Sept. 30, 2016) .............................................. 39

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) .................................................................................................. 18-19

*Debrew v. Atwood,*
    792 F.3d 118 (D.C. Cir. 2015) ........................................................................... 39

*Dep't of Army v. Blue Fox, Inc.,*
    525 U.S. 255 (1999) ........................................................................................... 39

*Ellis v. C.I.R.,*
    67 F. Supp. 3d 326 (D.D.C. 2014) ..................................................................... 29

*FDIC v. Meyer,*
    510 U.S. 471 (1994) ............................................................................... 4, 39, 40

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs,*
    873 F. Supp. 2d 363 (D.D.C 2012) ................................................................... 20

*Food & Water Watch, Inc. v. Vilsack,*
    79 F.3d 174 (D.D.C. 2015) ................................................................................ 29

*Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n,*
    103 F. Supp. 3d 115 (D.D.C. 2015) ................................................................... 39

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.,*
    528 U.S. 167 (2000) ........................................................................................... 32

*Gordon v. Haas,*
    828 F. Supp. 2d 13 (D.D.C. 2011) ..................................................................... 31

*Grocery Mfrs. Ass'n v. EPA,*
    693 F.3d 169 (D.C. Cir. 2012) ..................................................................... 29, 30

*Haase v. Sessions,*
    835 F.2d 902 (D.C. Cir. 1987) ........................................................................... 32

*Jackson v. U.S. Parole Comm'n,*
    806 F. Supp. 2d 201 (D.D.C. 2011) ................................................................... 24

*Klayman v.* Obama,
    142 F. Supp. 3d 172 (D.D.C. 2015) ............................................................ *passim*

*Klayman v. Obama,*
    957 F. Supp. 2d 1 (D.D.C. 2013) ................................................................ *passim*

*Laird v. Tatum,*
    408 U.S. 1 (1972) ............................................................................................... 38

*Leonard v. U.S. Dep't of Def.,*
    598 F. App'x 9 (D.C. Cir. 2015) ........................................................................ 20

*Long v. ATF*,
   964 F. Supp. 2d 494 (D.D.C. 1997) ................................................................ 22

*Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ................................................................ 20, 26, 32

*Loumiet v. United States*,
   828 F.3d 935 (D.C. Cir. 2016) ................................................................ 40

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................ 19, 28

*Lyles v. Hughes*,
   83 F. Supp. 3d 315 (D.D.C. 2015) ................................................................ 39

*Montgomery v. Risen*,
   -- F. Supp. 3d --, 2106 WL 3919809 (D.D.C. July 15, 2016) ................................................................ 27

*Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*,
   785 F.3d 684 (D.C. Cir. 2015) ................................................................ 19, 26

*Nat'l Ass'n of Home Builders v. U.S. Fish & Wildlife Serv.*,
   34 F. Supp. 3d 50 (D.D.C. 2014) ................................................................ 30

*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*,
   468 F.3d 826 (D.C. Cir. 2006) ................................................................ 29

*NBC-USA Housing, Inc., Twenty-six v. Donovan*,
   674 F.3d 869 (D.C. Cir. 2012) ................................................................ 22, 31

*New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*,
   2016 WL 4919871 (D.D.C. Sept. 14, 2016) ................................................................ 29

*Northwest Airlines, Inc. v. FAA*,
   795 F.2d 195 (D.C. Cir. 1986) ................................................................ 30

*Obama v. Klayman*,
   800 F.3d 559 (D.C. Cir. 2015) ................................................................ 3, 17, 21, 33

*Palm v. Paige*,
   161 F. Supp. 2d 26 (D.D.C. 2001) ................................................................ 30

*Petro-Chem Processing, Inc. v. EPA*,
   866 F.2d 433 (D.C. Cir. 1989) ................................................................ 29

*Richards v. Duke University,*
   480 F. Supp. 2d 222 (2007) ................................................................... 20

*Robinson v. United States,*
   2014 WL 5139832 (D.D.C. Jan. 24, 2014) ............................................. 19

*Shepherd v. Am. Broadcasting Co.,*
   62 F.3d 1469 (D.C. Cir. 1995) ................................................................ 27

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976) .................................................................................. 30

*Smith v. EEOC,*
   --- F. Supp. 3d ---, 2016 WL 6078259 (D.D.C. Oct. 17, 2016) ............... 39

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ................................................................................ 19

*Tri-State Hosp. Supply Corp. v. United States,*
   341 F.3d 571 (D.C. Cir. 2003) ................................................................ 39

*United Presbyterian Church in the USA v. Reagan,*
   738 F.2d 1375 (D.C. Cir. 1984) .............................................................. 38

*United States v. Concentrated Phosphate Export Ass'n,*
   393 U.S. 199 (1968) ................................................................................ 33

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,*
   454 U.S. 464 (1982) ................................................................................ 18

*Williams v. Lew,*
   77 F. Supp. 3d 129 (D.D.C. 2015) .......................................................... 19

*Worth v. Jackson,*
   451 F.3d 854 (D.C. Cir. 2006) ................................................................ 19

*Zhi Chen v. Dist. of Columbia,*
   839 F. Supp. 2d 7 (D.D.C. 2011) ............................................................ 27

**STATUTES**

28 U.S.C. § 1291 .......................................................................................... 28

50 U.S.C. § 1801 .......................................................................................... 12

50 U.S.C. § 1821 .......................................................................................... 12

50 U.S.C. § 1842.................................................................................................... 10, 32

50 U.S.C. § 1861.................................................................................................... *passim*

50 U.S.C. § 1881a.................................................................................................. 11, 12, 36

USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001) ...................................... 4

FISA Amendments Act of 2008, Pub. L. No. 110-261, 122 Stat. 2436 (2008)........................... 11

USA FREEDOM Act of 2015, Pub. L. No. 114-23, 129 Stat. 268 (2015)........................... *passim*

## FEDERAL RULE OF CIVIL PROCEDURE

Rule 12(b)(1).......................................................................................................... 19, 37

Rule 54(b) .............................................................................................................. 28

## MISCELLANEOUS

5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350
   (3d ed. 2004) ...................................................................................................... 20

## INTRODUCTION

The Section 215 bulk telephony-metadata program once conducted by the National Security Agency ("NSA"), and which originally animated Plaintiffs' claims in these cases, is now in the past.  The USA FREEDOM Act now bars bulk collection of call-detail records (*i.e.* telephony metadata) under Section 215.  Accordingly, the Foreign Intelligence Surveillance Court ("FISC") has not re-authorized bulk collection of such records, the NSA no longer obtains them in bulk, and the agency no longer queries the bulk data it obtained under Section 215, analytic access to which is barred by FISC order.  Indeed, the sole reason the NSA still maintains bulk data accumulated under the Section 215 program is to comply with the Government's duty in the cases at bar, and others, to preserve evidence that may be relevant to legal challenges concerning the program that remain pending, despite its termination.  And once applicable preservation obligations are lifted the NSA must promptly destroy the data, again as directed by FISC order.  Three years ago this Court described these cases, *Klayman v. Obama*, Nos. 13-cv-851 and 13-cv-881 (RJL) ("*Klayman I*" and "*Klayman II*") as "the latest chapter in the Judiciary's continuing challenge to balance the national security interests of the United States with the individual liberties of our citizens."  *Klayman v. Obama*, 957 F. Supp. 2d 1, 43 (D.D.C. 2013).  Today, under the fundamentally changed circumstances in which these cases now lie, they can no longer be considered to present a meaningful, or justiciable, case or controversy.

The Plaintiffs in *Klayman I* and *Klayman II* challenge the NSA's prior collection and analysis of bulk telephony metadata, pursuant to Section 215, as a violation of their constitutional rights under the First, Fourth, and Fifth Amendments.  They seek declaratory and injunctive relief against future bulk collection of metadata about their calls, against NSA queries of metadata about their calls that may have been collected under the program, and expungement of any such data from the Government's records.  The Government Defendants continue to

maintain that none of the Plaintiffs to these cases has established Article III standing to assert these claims.  But even assuming, as the Court has previously found, that plaintiffs J.J. Little and his law firm, J.J. Little & Associates (together, the "Little Plaintiffs") have made a sufficient showing that records of their telephone calls were collected under the Section 215 program before its termination, *see Klayman v. Obama*, 142 F. Supp. 3d 172, 186-88 (D.D.C. 2015), they cannot show, in fact, that their claims give rise to an Article III case or controversy.

First, Plaintiffs' claims for declaratory and injunctive relief against further bulk collection or queries of metadata pertaining to their calls are moot.  Since the commencement of these actions the USA FREEDOM Act has unequivocally barred future bulk collection of telephony metadata under Section 215, and the FISC has prohibited analytic access to the bulk data, collected under Section 215, that remain in the NSA's possession.  Thus, as the record now reflects, the NSA has ceased its prior collection and querying of bulk telephony metadata, and the relief Plaintiffs seek would serve no useful purpose.  The voluntary cessation doctrine does not revive Plaintiffs' claims; where Congress has prohibited bulk collection, and a standing order of the FISC already prohibits further analytic access to the remaining bulk data, the NSA is not free to return to these activities, and its termination of the challenged conduct cannot be deemed "voluntary."  For much the same reasons, Plaintiffs cannot demonstrate standing to obtain prospective declaratory or injunctive relief against operation of the Section 215 program.

Second, Plaintiffs lack standing to seek expungement of the bulk telephony metadata collected under Section 215 where, as discussed below, Plaintiffs have demanded that any records of their calls be preserved until the conclusion of this litigation; where the Government remains obligated to preserve the data in other pending cases; and where the FISC has already ordered that the data be destroyed once applicable preservation obligations are lifted.  Under these circumstances, any harm Plaintiffs suffer from the NSA's continued possession of the

remaining bulk data is not fairly traceable to the Government Defendants, as Article III requires, but instead to Plaintiffs themselves, and to litigants in other cases who are not before this Court.

In addition to the Section 215 program, Plaintiffs also seek the same variety of declaratory, injunctive, and other equitable relief, on the same constitutional grounds, against two other NSA intelligence programs—the discontinued program of bulk Internet metadata collection, carried out under FISA's "pen/trap" provision; and targeted "PRISM" collection of electronic communications to or from non-U.S. persons located outside the United States, conducted under FISA Section 702.  As a matter of fact, however, these claims do not now present and never have presented a justiciable Article III case or controversy.

The NSA's FISC-authorized collection of bulk Internet metadata was discontinued and the accumulated bulk data were destroyed in December 2011, long before these cases were filed, and Plaintiffs have offered no reason for believing that the program is likely, imminently or otherwise, to be resumed.  Indeed, the USA FREEDOM Act also bars use of FISA's pen/trap provision for purposes of bulk collection.  In addition, Plaintiffs have advanced no allegations or evidence about the scale or scope of the bulk Internet metadata program from which it can be concluded that metadata about their online communications were ever collected in connection with that program; under the reasoning of *Obama v. Klayman*, 800 F.3d 559 (D.C. Cir. 2015), the fact alone that it was a program of bulk collection is not enough.  Thus Plaintiffs have shown no past, present, or likely future injury attributable to the bulk Internet metadata program on which to predicate claims for equitable relief.

The same holds true regarding PRISM collection.  Like the plaintiffs in *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138 (2013), Plaintiffs here have not alleged, much less proven, any facts showing that either they themselves, or individuals with whom they communicate online, ever have been or likely will be targets of surveillance under PRISM.  At best, Plaintiffs

3

can only speculate whether communications of theirs ever have been or likely will be collected

under this targeted program, and thus, as previously held by this Court, *Amnesty International*

dictates that they lack standing to contest its operation.  *Klayman*, 957 F. Supp. 2d at 8 n.6.

Finally, if the complaints in these cases are to be taken at face value, then Plaintiffs also

purport to assert constitutional tort claims against the Government Defendants,[1] seeking billions

of dollars in damages for the NSA's conduct of the challenged intelligence programs.  Even if

any of the Plaintiffs had established their standing to assert such claims, Congress has never

waived the Government's sovereign immunity against damages claims for constitutional torts, as

held by the Supreme Court in *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

For all of these reasons, discussed at greater length below, neither *Klayman I* nor

*Klayman II* presents a live case or controversy, in fact, that falls within the subject-matter

jurisdiction of this Court.  Both cases, accordingly, should be dismissed.

## BACKGROUND

### The Section 215 Bulk Telephony-Metadata Program

The NSA's bulk telephony-metadata program began operation in May 2006, under

authority of FISC orders issued pursuant to the "business records" provision of the Foreign

Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1861, as amended by Section 215 of the

USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001).  Section 215 authorizes the

Government to apply to the FISC for an order requiring the "production of any tangible things

. . . for an investigation," *inter alia*, "to protect against international terrorism . . . ."  50 U.S.C.

---

[1] The Government Defendants are defendants Barack H. Obama, President of the United States; Loretta E. Lynch, Attorney General of the United States; General Keith B. Alexander, Director of the National Security Agency ("NSA"); James R. Clapper, Director of National Intelligence ("DNI"); John O. Brennan, Director of the Central Intelligence Agency ("CIA"); and James B. Comey, Director of the Federal Bureau of Investigation ("FBI"), insofar as they are sued in their official capacities, together with defendants NSA, the United States Department of Justice, the CIA, and the FBI.

§ 1861(a)(1).  Until the termination of the Section 215 program in November 2015, the

Government obtained FISC orders directing certain telecommunications service providers to

produce, in bulk, "call-detail" records containing information about telephone calls, referred to

as metadata, such as the time and duration of a call and the dialing and receiving numbers, but

not its content.  Declaration of Wayne Murphy, Director of Operations, NSA, dated November

16, 2016 ("Murphy Decl.") (Exhibit 1, hereto), ¶¶ 6-7; *In re Application of the FBI for an Order

Requiring the Production of Tangible Things,* ECF No. BR 15-99, Primary Order (F.I.S.C. Aug.

27, 2015) ("Aug. 27, 2015 Primary Order") (Wayne Decl. Exh. A, hereto) at 3 n.1.  The FISC's

orders also expressly excluded "the name, address, or financial information of a [telephone]

subscriber or customer" from the operative definition of telephony metadata.  *See* Aug. 27, 2015

Primary Order at 3 n.1.[2]

The Government used bulk telephony metadata it collected under the Section 215

program to create an historical repository that could be queried by NSA analysts to ascertain

whether international terrorist organizations were communicating with operatives in the United

States, for the purpose of detecting and preventing intended terrorist attacks.  Murphy Decl. ¶¶ 6,

8-9.  *In re Application of the FBI for an Order Requiring the Production of Tangible Things from

[Redacted],* 2013 WL 5741573, at *1 (F.I.S.C. Aug. 29, 2013) (publicly released, unclassified

opinion).  These queries were conducted using selectors, such as telephone numbers, which were

approved at first by supervisory NSA officials, and beginning in February 2014 by the FISC,

based on a determination of reasonable, articulable suspicion that they were associated with

terrorist organizations under investigation by the Government.  Using approved selectors, NSA

analysts queried the bulk metadata to obtain telephone numbers (or other metadata) that had been

---

[2]  The FISC first authorized the program in May 2006, and thereafter renewed the
program 43 times, under orders issued by 19 different FISC judges.  *See* Murphy Decl. ¶ 7.

in contact within at first three, and later two steps, or "hops," of the suspected-terrorist selector. Murphy Decl. ¶ 9.[3]

Among other such "minimization procedures" designed to protect the privacy interests of U.S. persons,[4] until March 2014 the FISC's orders authorizing the Section 215 program directed that metadata obtained under the program be destroyed within five years after collection. Murphy Decl. ¶ 11.   Beginning March 2014, the FISC authorized the NSA to delay the destruction of accumulated metadata that had passed the five-year mark (but not to continue analytic queries of such data) solely to permit the Government to comply with its obligation to preserve potentially relevant evidence under orders issued in two civil cases, *Jewel v. NSA*, No. 4:08-cv-4373-JSW (N.D. Cal.), and *First Unitarian Church of Los Angeles v. NSA*, No. 4:13-cv-3287-JSW (N.D. Cal.), in which the plaintiffs, like Plaintiffs here, also assert (or purport to assert) challenges to the legality of the Section 215 program.  *See* Murphy Decl. ¶ 11.

As this Court is aware, *see Klayman*, 957 F. Supp. 2d at 7 n.2, the unauthorized public disclosure of the Section 215 program resulted in a number of lawsuits seeking declaratory and injunctive relief against its continued operation.[5]  In *Jewel, Shubert,* and *First Unitarian* the

---

[3]  "Although the Government has acknowledged that the Section 215 program was broad in scope and involved the collection and aggregation of a large volume of data from multiple telecommunications service providers, the program never captured information on all (or virtually all) calls made and/or received in the U.S."  Murphy Decl. ¶ 7.  *See also In re Application of the FBI*, 2013 WL 5741573, at *1 n.5 ("[P]roduction of all call detail records of all persons in the United States has never occurred under this program.").

[4]  In connection with a production order, Section 215 requires the Government to adopt and comply with FISC-approved procedures that "minimize the retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need . . . to obtain, produce, and disseminate foreign intelligence information."  50 U.S.C. §§ 1861(b)(2)(D), (c)(1), (g)(2), (h).  *See In re Application of the FBI*, 2013 WL 5741573, at *3 (Section 215 was "designed to ensure not only that the [G]overnment has access to the information it needs for authorized [counter-terrorism] investigations, but also that there are protections and prohibitions in place to safeguard U.S. person information.")

[5]  In addition to *Jewel* and *First Unitarian*, the cases at bar, and *Klayman III*, the cases referred to are *Shubert v. Obama*, No. 3:06-md-1791-VRW (N.D. Cal.) & 07-cv-00693-JSW

plaintiffs, again like Plaintiffs here, also bring claims for damages.  *Jewel*, Compl. (ECF No. 1)

(prayer for relief); *Shubert*, 2d Am. Compl. (ECF No. 771) (prayer for relief); *First Unitarian*, 2d

Am. Compl. (ECF No. 119) (prayer for relief).  The preservation orders in these three cases (the

*Jewel*, *Shubert*, and *First Unitarian* "Preservation Orders," filed herewith as Exhibits 2-4,

respectively), all remind the parties of their "duty to preserve evidence that may be relevant to

[the] action[s]," and direct the parties to halt the routine destruction of ,and arrange for the

preservation of, any such materials.  *Jewel* Preservation Order ¶¶ A, D; *Shubert* Preservation

Order ¶¶ A, D; *First Unitarian* Preservation Order ¶¶ A, E.[6]  No preservation orders have been

issued in the additional pending cases challenging the Section 215 program, but the common-law

duty to preserve potentially relevant evidence nonetheless attaches in those cases as well.

On March 27, 2014, the President announced, after considering options presented by the

Intelligence Community and the Attorney General, that he would seek legislation to replace the

Section 215 program with "a mechanism to preserve the capabilities we need without the

[G]overnment holding this bulk metadata," in order to "give the public greater confidence that

their privacy is appropriately protected."  Statement by the President on the [Section 215]

Program, http://www.whitehouse.gov/ the-press-office/2014/03/27/statement-president-section-

215-bulk-metadata-program.  Instead of the NSA obtaining telephony metadata in bulk, the

---

(N.D. Cal.); *ACLU v. Clapper*, No. 1:13-cv-03994-WHP (S.D.N.Y.); *Smith v. Obama*, No. 2:13-cv-00257-BLW (D. Idaho); *Paul v. Obama*, No. 1:14-cv-00262-RJL (D.D.C.); *Perez v. Obama*, No. 3:14-cv-00050 (W.D. Tex.); and *Jacobs v. Doe*, No. 1:14-cv-14766-ADB (D. Mass.).

[6]  The complaints in *Jewel* and *Shubert* were filed prior to the public disclosure and official acknowledgement of the statutorily authorized intelligence programs at issue here, and challenge earlier NSA bulk collection of communications metadata, and targeted surveillance of communications content, conducted under Presidential authorization.  The plaintiffs in *Jewel* and *Shubert* take the position, however, that their claims also extend to programs authorized by the FISC pursuant to FISA, and therefore construe the preservation orders in those cases to require preservation of documents and information (such as accumulated metadata) that relate not only to Presidentially authorized activities, but also to the statutorily based programs at issue here.

President proposed that the data should remain in providers' hands, and be produced to the NSA on a targeted basis only, pursuant to orders from the FISC.  *Id.*

Consistent with the President's objectives, on June 2, 2015, Congress enacted the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268.  The new statute, as of November 29, 2015, prohibits the Government from obtaining telephony metadata in bulk (*i.e.*, "without the use of a specific selection term") under Title V of FISA, *see id.* §§ 103 & 109, 129 Stat. at 272, 276; 50 U.S.C. § 1861(c)(3); Murphy Decl. ¶¶ 13.  In anticipation of this prohibition the last FISC order authorizing bulk collection of telephony metadata expired on November 28, 2015.  Aug. 27, 2015 FISC Order at 17; Murphy Decl. ¶ 13.  The NSA accordingly terminated the Section 215 program, and has now ceased all collection, querying, and analysis of bulk telephony metadata. Murphy Decl. ¶ 13.

In lieu of bulk collection under Section 215 Congress authorized, and the NSA has implemented, a new mechanism providing for targeted production of call-detail records by service providers.  *See* USA FREEDOM Act § 101, 129 Stat. 269-70; Murphy Decl. ¶ 14. Under the provisions of the USA FREEDOM Act, to secure production of call-detail records the Government must submit an application to the FISC identifying "a specific selection term," such as a telephone number, "to be used as the basis for production" of the call-detail records sought. To authorize collection the FISC must find that the Government has demonstrated (i) the relevance of the call-detail records sought to an authorized counter-terrorism investigation, and (ii) a reasonable, articulable suspicion that the proposed selection term is associated with a foreign power (or agent thereof) engaged in terrorist activities.  If the FISC approves the Government's application, the FISC may order a provider to produce to the Government for up to 180 days all call-detail records within two hops of the approved selection term.  50 U.S.C. § 1861(b)(2)(C) & (c)(1), (2)(F)(i), (iii), (iv); *see* Murphy Decl. ¶¶ 14-15.

As the NSA prepared to transition to the new program of targeted collection, the Government submitted for the FISC's approval a set of minimization procedures that would permit the NSA to retain and use, for limited purposes, the bulk metadata still possessed by the agency upon termination of the Section 215 program.  First, the Government sought authority to retain the data in order to comply with its applicable evidence preservation obligations, subject to the same restrictions the FISC had previously imposed on access to bulk metadata, exceeding five years in age, kept for evidence-preservation reasons.  *See supra*, at 6; Murphy Decl. ¶ 16. Second, the Government requested approval of a three-month period of technical access, ending February 29, 2016, to allow NSA technical personnel to verify the completeness and accuracy of productions under the new targeted system of telephony metadata collection.  Murphy Decl. ¶¶ 16.  The FISC approved these requests in an Opinion and Order issued on November 24, 2015 ("Nov. 24, 2015 FISC Order") (Murphy Decl. Exh. B).

In accordance with the terms of that order, no access to the retained bulk metadata for intelligence analysis purposes is now permitted (or has been since November 28, 2015).  To comply with applicable preservation obligations in other cases challenging the Section 215 program, the Government is permitted for now to retain the accumulated bulk data, and NSA technical personnel are authorized to access the data to maintain its integrity.  Technical access for that purpose involves no queries of the data.[7]  Once the Government's applicable preservation obligations are lifted, the FISC's order requires that the Government promptly destroy the remaining bulk metadata, and all query results, with the narrow exceptions of (1) information derived from the bulk metadata contained in disseminations (*e.g.*, intelligence

---

[7]  Under the FISC's order, any access to the bulk metadata that may in future become necessary for litigation purposes is permitted only following written notice to the FISC specifically describing the nature of and reason for the access.  Nov. 24, 2015 FISC Order at 7; Murphy Decl. ¶ 17 n.2.

reports) made in accordance with FISC-approved minimization procedures, and (2) the results of queries of the bulk metadata forming the basis of such disseminations.  Murphy Decl. ¶¶ 17-18; Nov. 24, 2015 FISC Order at 8.[8]

**The Discontinued Bulk Internet-Metadata Program Conducted Under FISA's Pen/Trap Provision**

As the Government has acknowledged, from July 2004 until December 2011, the NSA engaged in statutorily authorized bulk collection of Internet metadata—that is, of certain routing, addressing, and signaling information about Internet-based electronic communications such as e-mail—under orders issued by the FISC pursuant to Section 402 of FISA, FISA's pen-register and trap-and-trace provision (codified at 50 U.S.C. § 1842).  The data collected included, for example, information from the "to" and "from" lines in an e-mail, and the date and time the e-mail was sent, but not its content or the "subject" line.  *See* Murphy Decl. ¶¶ 19-20.   As with the Section 215 program, NSA analysts conducted queries and analysis of the accumulated bulk Internet metadata to obtain foreign intelligence information.  *Id.* ¶ 20.  The FISC orders authorizing this collection required the NSA to comply with "minimization procedures" limiting the retention and dissemination of the metadata, including a requirement of "reasonable articulable suspicion" that selection terms used to query the bulk data were associated with foreign terrorist organizations.  *Id.*  This now-discontinued program "operated on a very large scale," but the Government has never "disclosed the scope on which the program operated or any of the identities of the providers that received orders from the FISC."  *Id.*

---

[8]  The NSA is also permitted to retain summary reports prepared by NSA technical personnel based on data obtained during validation testing of the new targeted system of telephony metadata collection.  These summary reports do not contain any telephony metadata produced under the Section 215 Program or information that could be used to identify particular telephone calls.  Murphy Decl. ¶ 18.

In December 2011, because the program did not meet operational expectations, the Government decided not to seek authority from the FISC to continue collecting Internet metadata in bulk, and the program was terminated.  *Id.*  ¶ 21.  On December 7, 2011, the NSA completed the destruction of all bulk Internet metadata collected under FISC authorization from its repositories, in keeping with the principles of privacy protection underlying the destruction requirements imposed by the FISC.  *Id.*  On June 2, 2015, Congress, via the USA FREEDOM Act of 2015, Pub. L. No. 114-23, 129 Stat. 268, amended FISA Section 402, like Section 215, to prevent its use to collect information in bulk.  Pub. L. No. 114-23, 129 Stat. 268, § 201 ("Prohibition on Bulk Collection"); *see* 50 U.S.C. § 1842(c)(3).

**Targeted "PRISM" Collection of Communications Content Under FISA Section 702**

The FISA Amendments Act of 2008, Pub. L. 110-261, 122 Stat. 2436, added a new Section 702 to FISA, 50 U.S.C. § 1881a, which "supplement[ed] pre-existing FISA authority by creating a new framework under which the Government may seek the FISC's authorization of certain foreign intelligence surveillance targeting . . . non-U.S. persons located abroad," *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1144 (2013).  Section 702 provides that, upon the FISC's approval of a "certification" submitted by the Government, the Attorney General and DNI may jointly authorize, for a period of up to one year, the "targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information."  50 U.S.C. § 188la(a), (g); Murphy Decl. ¶ 23.  The Government must acquire the information from or with the assistance of an electronic communication service provider.  *Id.* § 1881a(g)(2)(A)(vi).  Under the express terms of Section 702, the Government may not intentionally target a U.S. person overseas or persons (including U.S. persons) known to be in the United States.  *Id.* § 1881a(b); Murphy Decl. ¶¶ 22-23.  The acquisition must also be "conducted in a manner consistent with the [F]ourth [A]mendment." *Id.*

Four requirements must be met for FISC approval of a Section 702 certification.  First, the FISC must find that the Government's "targeting procedures" submitted with the certification are reasonably designed to ensure that any acquisition conducted thereunder (a) will be limited to persons reasonably believed to be located outside the United States, and (b) will not intentionally acquire communications known at the time of acquisition to be purely domestic.  *Id.* § 1881a(i)(2)(B).  Second, the certification must contain all statutorily required elements, including, *inter alia*, an attestation that a significant purpose of the acquisitions is to obtain foreign-intelligence information.  *Id.* § 1881a(g)(2)(A)(v), (i)(2)(A).  Third, the FISC must find that the Government's minimization procedures meet FISA's requirements.  *Id.* § 1881a(i)(2)(C); *see also id.* §§ 1801(h), 1821(4).  And fourth, the FISC must find that the Government's targeting and minimization procedures are consistent, not only with FISA, but also with the Fourth Amendment. *Id.* § 1881a(i)(3)(A).

Upon FISC approval of a Section 702 certification, and related targeting and minimization procedures, the Attorney General and the DNI may issue directives to appropriate electronic communications-service providers compelling their assistance in the acquisition of the targeted communications.  *See* Murphy Decl. ¶ 24.  NSA analysts thereafter may designate specific electronic communications selectors to the providers, such as e-mail addresses, for production of communications to or from those selectors.  Prior to tasking a selector, however, NSA analysts must follow FISC-approved targeting procedures to ensure they are targeting a non-U.S. person reasonably believed to be located outside the United States, who will communicate or receive foreign intelligence information authorized for acquisition—such as, for example, members of a foreign terrorist organization.  Analysts must also assess whether tasking the particular selector will be likely to acquire foreign intelligence information.  These determinations then must undergo internal NSA review.  Once tasking requests receive approval

the selectors are sent to providers, which then furnish the Government with the electronic

communications to or from the approved selectors.  *See id.* ¶¶ 23-25.

PRISM collection of electronic communications is conducted pursuant to Section 702,

and as such is a program of targeted content collection, not bulk collection.  *See id.* ¶¶ 23, 26.  As

a Section 702 program, PRISM collection also cannot target a U.S. person; instead, the only

permissible targets are non-U.S. persons located abroad who possess or are likely to receive or

communicate foreign-intelligence information authorized for acquisition.  *See id.* ¶¶ 22-23.  The

identities of PRISM targets are classified, as are the identities of the electronic communications

service providers that assist in the acquisition of communications under Section 702.  *See id.* ¶

27.  PRISM collection does not include the acquisition of telephone calls.  *See id.* ¶¶ 25-26.

**Plaintiffs' Claims in *Klayman I* and *Klayman II***

In *Klayman I* and *Klayman II* Plaintiffs broadly allege that the NSA intelligence-

gathering activities described above involve collection of both metadata about and the contents

of Americans' telecommunications, and that the Government exploits this information to build

comprehensive profiles of ordinary Americans revealing intimate details about their lives and

personal associations.  *See, e.g.*, *Klayman II* 3d Am. Compl., ECF No. 106-1 ¶¶ 1-3.

Specifically, Plaintiffs allege that pursuant to a "secret and illegal … scheme" the Government

systematically "intercept[s] and analyze[s] vast quantities of communications for telephone,

Internet, and electronic service providers" including the "telephone metadata, Internet metadata,

and social media records" of U.S. citizens.  *Klayman I* 4th Am. Compl. ECF No. 145-1 ¶ 1;

*Klayman II* 3d Am. Compl. ¶¶ 1-3.  Plaintiffs further allege the Government collects records

from "all communication companies," *Klayman II* 3d Am. Compl. ¶ 2, allowing it to collect and

store "personal data" from these companies, including "e-mails, chat (video/voice), videos,

photos, stored data, VoIP, file transfers, video conferencing, notification of target activity (*i.e.*,

logins, etc.), online social networking details, and other special requests." *Id.*  ¶ 7.  Plaintiffs

contend that the NSA's alleged use of this information to build comprehensive profiles of

individuals' associations, expressive activities, and public movements impairs their "abilities to

communicate via telephone, e-mail, social media and otherwise on the Internet, out of fear that

their confidential, private, and often privileged communications are being and will be overheard

by the NSA's surveillance program." *Id.* ¶ 49; *Klayman I* 4th Am. Compl. ¶ 16.

 Although these allegations feature in some form in both the *Klayman I* and *Klayman II*

complaints, the cases' claims for relief differ.  All the claims in *Klayman I* are directed against

the NSA's bulk collection of telephony metadata under Section 215.  *Klayman I* 4th Am. Compl.

¶¶ 51, 54, 60, 67.  *Klayman II* reaches more broadly, challenging not only the Section 215

program but also the bulk collection of Internet metadata under FISA Section 402 (incorrectly

stated in the Complaint to occur under Section 215), the targeted collection of electronic

communications under PRISM, and something Plaintiffs refer to as "MUSCULAR."  *Klayman II*

3d Am. Compl. ¶¶ 10, 58, 63-64, 70, 73.

 Similarly, the plaintiffs named in *Klayman I* and *Klayman II* largely but not entirely

overlap.  Both complaints assert claims on behalf of Larry Klayman, Charles and Mary Ann

Strange, and the Little Plaintiffs.  *Klayman I* 4th Am. Compl. ¶¶ 9-18; *Klayman II* 3d Am.

Compl. ¶¶ 11-19, 22.  To these, *Klayman II* adds plaintiffs Michael Ferrari and Matt Garrison.

*Klayman II* 3d Am. Compl. ¶¶ 20-21.  According to the complaints, plaintiff Klayman is an

attorney and the founder, chairman, and general counsel of Freedom Watch, a self-styled public

interest organization engaged in political activism.  *Id.* ¶ 11.  He claims that, in light of his

foreign contacts and international communications, his communications have "inevitably" been

monitored by the Government.  *Id.* ¶ 18.  The Stranges are the parents of a U.S. Navy Seal killed

in Afghanistan in 2011.  *Id.* ¶ 19.  They claim to know that the Government has "accessed" their

"records" given their criticism of President Obama and the U.S. military, and their communications by e-mail and telephone with persons overseas.  *Id*.  The Little Plaintiffs claim that, because J.J. Little is a criminal defense lawyer, he is "in the line of fire" for Government surveillance.  *Id*. ¶ 22.  And Plaintiffs Ferrari and Garrison, identified as private investigators, claim that their communications must have been monitored by the Government because they communicate by e mail and telephone with foreign countries.  *Id*.  ¶¶ 20-21.

In both *Klayman I* and *Klayman II*, Plaintiffs claim that the challenged NSA programs violate their rights under the First, Fourth, and Fifth Amendments.  *Klayman I* 4th Am. Compl. ¶¶ 51-53, 58-60, 67; *Klayman II* 3d Am. Compl. ¶¶ 58, 62-64, 70-72.  Plaintiffs allege that these purported violations of their constitutional rights have caused them to suffer "severe emotional distress and physical harm, pecuniary and economic damages, loss of services, and loss of society."  *Klayman I* 4th Am. Compl. ¶¶ 55, 61, 68; *Klayman II* 3d Am. Compl. ¶¶ 59, 65, 74.  Based on these alleged harms, Plaintiffs seek compensatory and punitive damages, attorneys' fees, and costs, which Plaintiffs state amount to "in excess of" $12 billion in *Klayman I* and $20 billion in *Klayman II*.  *Klayman I* 4th Am. Compl. ¶ 70; *Klayman II* 3d Am. Compl. ¶ 76.  In addition, both complaints request "declaratory, equitable, and injunctive relief" that (1) enjoins the challenged intelligence activities; and (2) requires the NSA to prepare an accounting of, "expunge[] from federal Government records," and return to their service providers any collected data pertaining to Plaintiffs' communications.  *Klayman I* 4th Am. Compl. ¶ 71; *Klayman II* 3d Am. Compl. ¶ 77.[9]

---

[9]  A third, related case brought by Plaintiffs is also pending.  On January 23, 2014, the then-*Klayman II* Plaintiffs (plus Mary Ann Strange) filed suit in *Klayman v. Obama*, No. 14-cv-92 (RJL) ("*Klayman III*"), which, apart from the inclusion of class-action allegations, is a virtual carbon copy of the action in *Klayman II*.  The Government Defendants moved to dismiss the *Klayman III* complaint on the grounds, *inter alia*, that it constitutes improper "claims splitting," because Plaintiffs are simultaneously maintaining more than one action involving the same subject matter and the same claims against the same defendants.  *See Klayman III*, Mem. of Pts.

**Proceedings to Date in *Klayman I* and *Klayman II***

Plaintiffs filed suit in *Klayman I* on June 6, 2013, and in *Klayman II* less than one week later.  *See Klayman I* Compl., ECF No. 1; *Klayman II* Compl., ECF No. 1.  On October 29, 2013, Plaintiffs moved for preliminary injunctions against all of the NSA intelligence programs challenged in *Klayman I* and *II*.  *See Klayman I*, Pls.' Mot. for Prelim. Inj., ECF No. 13; *Klayman II*, Pls. Mot. for Prelim. Inj., ECF No. 10.  The Court denied Plaintiffs' motion in *Klayman II*, but in *Klayman I* granted Plaintiffs Klayman and Charles Strange a preliminary injunction that, *inter alia*, barred bulk collection of records about their telephone calls under Section 215.  *Klayman*, 957 F. Supp. 2d at 8 n.6, 10, 43 & n.69.   The Court stayed its injunction, however, pending appeal.  *See id.* at 43.

After appealing the Court's preliminary injunction to the D.C. Circuit, the Government Defendants moved for partial dismissal of many of the remaining claims in *Klayman I* and *Klayman II*.  *See Klayman* I, Gov't Defs.' Mot. for Partial Dismissal, ECF No. 68; *Klayman II*, Gov't Defs.' Mot. for Partial Dismissal, ECF No. 51.  Subsequently, on July 30, 2014, the Court stayed all district court proceedings pending the outcome of the Government's appeal.  *See* Minute Orders (July 30, 2014).  Thereafter, on August 28, 2015, the Court of Appeals vacated the Court's preliminary injunction, because Plaintiffs had not adequately established a substantial likelihood of injury from Government collection of records about their telephone calls.  *See Klayman*, 800 F.3d at 564 (Brown, J.); *id.* at 568 (Williams, J.); *id.* at 570 (Sentelle, J.).  In particular, Judges Williams and Sentelle agreed that collection of records from Plaintiffs' telephone service provider could not be inferred from the fact, standing alone, that the Section

---

& Auths. in Support of the Gov't Defs.' Mot. to Dismiss, Dkt No. 17-1, at 7-10; Gov't Defs.' Reply in Support of their Mot. to Dismiss, ECF No. 27, at 4-9.  The Court should dismiss that duplicative action on those (fully briefed) grounds; alternatively, it can dismiss *Klayman III* for the reasons set forth in this brief.  A fully briefed motion to dismiss the individual-capacity defendants for lack of service of process is also pending in *Klayman III*.  *See* ECF No. 49.

215 program involved bulk collection of metadata on a large scale.  *Id.* at 565-66 (Williams, J.); *id.* at 569 (Sentelle, J.).

On remand, Plaintiffs moved for and obtained leave to amend their complaints in *Klayman I* and *II*.  The operative complaint in *Klayman I* is now the Fourth Amended Complaint, *see* ECF No. 145-1, and in *Klayman II* is the Third Amended Complaint, *see* ECF No. 106-1.  As relevant here, these complaints added the Little Plaintiffs as parties to both actions, who allege that at all material times they have been subscribers to telephone service provided by Verizon Business Network Services.  *See* 4th Am. Compl., ECF No. 145-1 ¶ 18; 3d Am. Compl., ECF No. 106-1 ¶ 22.  The Fourth Amended Complaint in *Klayman I* also pleads additional facts intended to support Plaintiffs' allegation that Verizon Wireless was a participating telecommunications service provider in the Section 215 program.  *See Klayman I*, 4th Am. Compl., ECF No. 145-1 ¶¶ 47-48.

Plaintiffs then renewed their motion for a preliminary injunction against the Section 215 program on September 21, 2015.  *See Klayman I*, ECF No. 149.  Together with that motion they submitted a proposed form of order that included terms prohibiting the Government from destroying "any records relating to the Plaintiffs until this case is tried and all appeals are heard, and only then to purge them from government retention."  *Klayman I*, Proposed Order, ECF No. 149-3. On November 9, 2015, the Court granted the Little Plaintiffs a preliminary injunction barring bulk collection of records about their calls under Section 215, but denied relief to the other Plaintiffs. *Klayman v. Obama*, 142 F. Supp. 3d 172, 198 (D.D.C. 2015).

The Government Defendants appealed the Court's renewed preliminary injunction, and the D.C. Circuit issued a stay of the injunction pending appeal.  *See Klayman v. Obama*, No. 15-5307, Doc. # 1583836 (D.C. Cir. Nov. 16, 2015).  Following enactment of the USA FREEDOM Act of 2015, the Government Defendants moved to vacate the injunction and dismiss the appeal as moot

upon termination of the Section 215 program.  The Court of Appeals granted the Government's

request, vacating the injunction and dismissing the appeal as moot on April 4, 2016.  *See Klayman v.*

*Obama*, No. 15-5307, Doc. # 1606954 (D.C. Cir. Apr. 4, 2016).

On remand again, the individual-capacity defendants moved to dismiss the claims against

them in *Klayman I* and *II* based on Plaintiffs' failure to effect service of process.  The Court

granted that motion on September 24, 2016.  *Klayman I*, Mem. Order, ECF No. 175-1, at 1-4;

*Klayman II*, Mem. Order, ECF No. 120.  The Court also observed that the Government's pending

motion for partial dismissal in *Klayman I* had been rendered moot, because the complaint in that

case had been amended several times since the motion was filed in January 2014.  *See*

*Klayman I*, Mem. Order, ECF No. 175-1, at 4.  The Court accordingly ordered the parties to file

a proposed schedule for submission and briefing of a renewed dispositive motion by the

Government Defendants.  As directed the Government Defendants submitted a proposal for re-

submission and briefing of dispositive motions in both *Klayman I* and *Klayman II*, which the

Court adopted.  *See* Minute Scheduling Order (Oct. 10, 2016).

## ARGUMENT

## I.    LEGAL STANDARDS

"[T]he judicial power of the United States" is limited by Article III of the Constitution

"to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll. v. Ams. United for*

*Separation of Church & State*, 454 U.S. 464, 471 (1982); *see DaimlerChrysler Corp. v. Cuno*,

547 U.S. 332, 341 (2006).  "Three inter-related judicial doctrines—standing, mootness, and

ripeness, ensure that federal courts assert jurisdiction only over 'Cases' and 'Controversies'" as

Article III requires.  *Williams v. Lew*, 77 F. Supp. 3d 129, 132 (D.D.C. 2015) (quoting *Worth v.*

*Jackson*, 451 F.3d 854, 855 (D.C. Cir. 2006)), *aff'd*, 819 F.3d 466 (D.C. Cir. 2016).

18

"A core element of Article III's case-or-controversy requirement is that a plaintiff have standing to sue." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  To establish Article III standing, Plaintiffs must seek relief from an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Amnesty Int'l*, 133 S. Ct. at 1147.  The Supreme Court has emphasized that the standing inquiry must be "especially rigorous" when reaching the merits of a case would force a court to decide whether actions taken by the other branches of the Federal Government, especially in the fields of intelligence gathering and foreign affairs, are unconstitutional.  *Id.*

Plaintiffs "bear[] the burden of showing that [they have] standing for each type of relief sought."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *see also, e.g.*, *Robinson v. United States*, 2014 WL 5139832 (D.D.C. Jan. 24, 2014) (Leon, J).  As to any claims for prospective relief "it would not be enough . . . to demonstrate past harm"; instead, plaintiffs must show they are "suffering an ongoing injury or face[] an immediate threat of injury." *Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 689 (D.C. Cir. 2015) (citing *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)); *see also Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1280 (D.C. Cir. 2012).  To meet that standard, "plaintiff[s] must show that there is a 'substantial risk' that the harm will occur," *Morgan Drexen, Inc.*, 785 F.3d at 689 (quoting *Amnesty Int'l*, 133 S. Ct. at 1150 n.5), and is "not conjectural or hypothetical," *Coal. for Mercury-Free Drugs*, 671 F.3d at 1280 (quoting *Lujan*, 504 U.S. at 560).  This requirement of "sufficient immediacy and reality" applies to claims for declaratory and injunctive relief alike; for a plaintiff to have standing to pursue either form of relief, there must be "a present, live controversy."  *Lyons*, 461 U.S. at 104-05; *see also, e.g.*, *Leonard v. U.S. Dep't of Def.*, 598 F. App'x 9, 10 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 261 (2015).

The related doctrine of mootness requires that a live case or controversy be present throughout the litigation.  Regardless of whether Plaintiffs had standing to bring a particular claim when they initially filed suit, if "events have so transpired that [the court's] decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future," the claim is moot and must be dismissed.  *Chamber of Commerce. v. EPA*, 642 F.3d 192, 210 (D.C. Cir. 2011) (citation omitted).

Federal Rule of Civil Procedure 12(b)(1) provides the mechanism by which a party may seek dismissal of a claim for lack of subject-matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  "A defendant may make a factual attack on the Court's subject matter jurisdiction under [Rule] 12(b)(1)"—as the Government Defendants make here—"as opposed to a facial attack based solely on the complaint."  *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012).  "[W]hen a court is reviewing a complaint under factual attack for lack of jurisdiction, no presumption of truthfulness applies to the factual allegations."  *Richards v. Duke University*, 480 F. Supp. 2d 222, 232 (D.D.C. 2007) (quotation omitted).  Rather, the court "may look to material outside the pleadings, *id.*, including "affidavits and other additional matter" such as the Government offers here, *see Finca Santa Elena, Inc.*, 873 F. Supp. 2d at 368 (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed. 2004)).  Indeed, on such a motion, the Court has "broad discretion to consider relevant and competent evidence."  *Id.* (quoting Wright & Miller, Federal Practice and Procedure § 1350).  In sum, in this setting, "the district judge is not obliged to accept the plaintiff's allegations as true and may examine evidence to the contrary and reach his or her own conclusions on the matter."  *Id.* (quoting Wright & Miller, Federal Practice and Procedure § 1350).

## II.     NO CASE OR CONTROVERSY REMAINS REGARDING THE NOW-DISCONTINUED BULK TELEPHONY-METADATA PROGRAM.

This Court has already ruled that the evidence submitted by plaintiffs Klayman and the Stranges is insufficient, under the Court of Appeals' reasoning in *Obama v. Klayman*, to establish their standing to challenge past or future collection of bulk telephony metadata under Section 215.  *Klayman*, 142 F. Supp. 3d at 184-186; *see Klayman*, 800 F.3d at 565-70 (opinions of Williams & Sentelle, JJ.).  Plaintiffs Ferrari and Garrison have produced no evidence of standing.  The Government Defendants also respectfully continue to submit that the remaining plaintiffs, the Little Plaintiffs, have failed to establish their standing to pursue claims for equitable relief against the Section 215 program, for the reasons stated in the Government's opposition to Plaintiffs' renewed motion for a preliminary injunction.  *See Klayman I*, Gov't Defs.' Opp. to Pls.' Renewed Mot. for a Prelim. Inj., ECF No. 150, at 18-19.  Recognizing that the Court has already concluded otherwise, *see Klayman*, 142 F. Supp. 3d at 186-88, the Government will not repeat those arguments, but instead incorporates them here by reference. Even assuming, however, that any of the Plaintiffs had standing to seek equitable relief at the time the Court issued its renewed preliminary injunction, their challenge to the Section 215 program no longer presents an Article III case or controversy that the Court may entertain.

### A.     The Court Lacks Jurisdiction to Hear Plaintiffs' Claims for Declaratory and Prospective Injunctive Relief Against the Section 215 Program.

Plaintiffs' claims for declaratory and injunctive relief against the Section 215 program present no live case or controversy because they are moot.  That is so because the USA FREEDOM Act now prohibits the bulk collection of telephony metadata under Section 215, a standing FISC order prohibits analytic access to data collected under the program that have been retained for preservation purposes, and the NSA, in accordance with that order, now conducts no queries of the data.

First, Plaintiffs' request for "a cease and desist order to prohibit" the bulk collection of records about their phone calls under Section 215, *see Klayman I*, 4th Am. Compl., ECF No. 145-1 ¶¶ 54, 71, is moot because Congress has enacted legislation prohibiting such bulk collection. *See* USA FREEDOM Act of 2015, Pub L. No. 114-23 §§ 103, 109, 129 Stat. 268, 272, 276; 50 U.S.C. § 1861(c)(3).[10] "It is well established that a case must be dismissed as moot if new legislation addressing the matter in dispute is enacted while the case is still pending." *ABA v. FTC*, 636 F.3d 641, 643 (D.C. Cir. 2011).

From May 2006 to November 2015, the FISC approved the collection and ordered the production of bulk telephony metadata pursuant to authority conferred by Section 215 of the USA PATRIOT Act, *see* 50 U.S.C. § 1861; Murphy Decl. ¶ 7.  On June 2, 2015, however, Congress enacted the USA FREEDOM Act, which prohibited the bulk collection of telephony metadata under Section 215, beginning 180 days after its enactment, *see* Pub L. No. 114-23 §§ 103, 109, 129 Stat. 268, 272, 276; 50 U.S.C. § 1861(c)(3), replacing *bulk* collection with a new mechanism providing for *targeted* production of call-detail records by telecommunications service providers, pursuant to FISC order.  *See id.* § 101, 129 Stat. 269-70; Murphy Decl. ¶ 13.

At the end of the 180-day transition period on November 28, 2015, statutory authority (and FISC authorization) to conduct the Section 215 program ended.  *See* USA FREEDOM Act of 2015, Pub L. No. 114-23 §§ 103, 109, 129 Stat. 268, 272, 276; Aug. 27, 2015, FISC Order (Murphy Decl. Exh. A) at 17; *see also Klayman*, 142 F. Supp. 3d at 177 ("[T]he USA FREEDOM Act specifically prohibits the bulk collection of telephony metadata, but not until

---

[10]  If the Court finds that Plaintiffs' claims for prospective injunctive relief against the Section 215 program are moot, their claims for declaratory relief as to the same program cannot survive because "a declaratory judgment may not be used to secure judicial determination of moot questions." *Long v. ATF*, 964 F. Supp. 494, 497 (D.D.C. 1997) (citation omitted); *see also NBC-USA Housing, Inc., Twenty-six v. Donovan*, 674 F.3d 869, 873 (D.C. Cir. 2012) ("Where an intervening event renders the underlying case moot, a declaratory judgment can no longer affect the behavior of the defendant towards the plaintiff.") (citation omitted).

November 29, 2015."). Accordingly, on that date the NSA terminated its bulk collection of telephony metadata, *see* Murphy Decl. ¶ 13. Plaintiffs' requests for declaratory and prospective injunctive relief against bulk collection of telephony metadata are therefore moot. *See Klayman v. Obama*, No. 15-5307, Doc. # 1606954 (D.C. Cir. Apr. 4, 2016) (dismissing appeal of renewed preliminary injunction as moot because, by that time, the enjoined conduct had ended).

Second, Plaintiffs' request for "a cease and desist order to prohibit" the NSA from querying records of Plaintiffs' phone calls allegedly collected under the Section 215 program, *see Klayman I*, 4th Am. Compl., ECF No. 145-1 ¶¶ 51, 71, is also moot because the FISC has prohibited the NSA from accessing any such metadata for intelligence analysis purposes. *See* Nov. 24, 2015 FISC Order (Murphy Decl. Exh. B) at 6; Murphy Decl. ¶ 17. The FISC's order allowed for temporary, limited access by NSA technical personnel from November 29, 2015, to February 29, 2016, "solely for the purpose of verifying the completeness of call detail records produced under the targeted (i.e., non-bulk) production orders issued" by the FISC after the new targeted program began. Nov. 24, 2015 FISC Order, at 6; *see also* Murphy Decl. ¶ 17. But that limited access ended nearly seven months ago. *See id.*.

Otherwise, the FISC has limited access to the previously collected bulk data exclusively to NSA technical personnel, for the single purpose of "ensur[ing] continued compliance with the government's preservation obligations and the continued integrity of" the data. Nov. 24, 2015 FISC Order, at 7; *see also* Murphy Decl. ¶ 17. Maintaining the integrity of the data does not require that the data be queried. *Id.* Accordingly, the NSA has discontinued queries of the bulk metadata, and maintains the data solely for preservation purposes. *See id.* As a result, Plaintiffs' request for an order prohibiting NSA queries of the metadata that they denounced at the outset of these cases as "unreasonabl[e] search[es]" of phone records "without reasonable suspicion or probable cause," *see Klayman I*, 4th Am. Compl., ECF No. 145-1 ¶¶ 51, 71, is now moot. *See*

*Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013) (mootness is judged by the "conduct that precipitated the lawsuit").

Neither of the two exceptions to the mootness doctrine apply here.  The first exception "pertains to situations in which the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, yet there is a demonstrated probability that the same controversy will recur involving the same complaining party."  *ABA*, 636 F.3d at 647.  This exception plainly does not apply here, where the challenged conduct continued for nearly a decade.  *See Klayman*, 142 F. Supp. 3d at 198; *Klayman*, 957 F. Supp. 2d at 43; *see also Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 690 (D.C. Cir. 1996) (conduct of "less than two years' duration ordinarily evade[s] review").  And there is little chance that this dispute will recur, in light of the federal statute and standing court order that prohibit repetition of the challenged conduct.

The "voluntary cessation" exception to the mootness doctrine does not apply here, either.  "As a general rule, a defendant's voluntary cessation of allegedly illegal conduct does not deprive a court of power to hear and determine the case."  *ABA*, 636 F.3d at 648.  The "rationale supporting voluntary cessation as an exception to mootness is that, without an order from the Court preventing [the defendant] from continuing the allegedly illegal practice, the defendant [would be] free to return to its old ways[,] thereby subjecting the plaintiff to the same harm but, at the same time, avoiding judicial review."  *Jackson v. U.S. Parole Comm'n*, 806 F. Supp. 2d 201, 207-08 (D.D.C. 2011) (citation omitted); *see also Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990) (exception developed to prevent private defendants from "manipulating the judicial process").

That concern is not present here, as the NSA is not "free" to restart the Section 215 program.  Instead, the USA FREEDOM Act bars bulk collection of telephony metadata (or any

other type of information) under Section 215.  Pub L. No. 114-23 §§ 103, 109, 129 Stat. 268, 272, 276; 50 U.S.C. § 1861(c)(3) ("No order issued under [Section 215] may authorize the collection of tangible things without the use of a specific selection term . . . .").  Even if in the future the Government were to ask the FISC to approve additional bulk collection of telephony metadata, the FISC could not be expected to grant such a request, or to issue orders compelling providers to produce telephony metadata in bulk, in the face of this unambiguous statutory prohibition.  *See* Nov. 24, 2015 FISC Order at 3 (USA FREEDOM Act "clearly forecloses the issuance [of orders permitting] additional bulk collection after November 28, 2015.").  When "intervening legislation" "nullifie[s]" the agency program, the cessation of the program is "not voluntary" and thus "not within the compass of the voluntary cessation exception to mootness." *ABA*, 636 F.3d at 648 ("intervening legislation simply nullified the FTC's policy" and thus its "abandonment" of that policy was "not voluntary").

Similarly, regardless of whether this Court grants relief prohibiting the NSA from querying the bulk telephony metadata already collected, the NSA is not "free" to recommence queries of the data as before.  This is so because the NSA is already forbidden by order of an Article III court to conduct analytic queries of the remaining bulk telephony metadata collected under the Section 215 program, and the technical access permitted under that order for preservation reasons does not necessitate queries of the data.  *See* Nov. 24, 2015 FISC Order at 6, 9; Murphy Decl. ¶ 17.  Accordingly, the voluntary cessation exception does not apply to that now prohibited conduct, either.

Plaintiffs' claims regarding collection and queries of bulk telephony metadata are not only moot, but by the same token the prospective relief they seek is unavailable absent a showing that Plaintiffs face ongoing or imminent threat of injury.  *Lyons*, 461 U.S. at 105.  Even if it were shown that records of Plaintiffs' calls were collected before the Section 215 program terminated,

a demonstration of past harm is not a sufficient basis on which to obtain prospective relief.

*Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 689 (D.C. Cir. 2015) (citing

*Lyons*, 461 U.S. at 105); *see also Coal. For Mercury-Free Drugs*, 671 F.3d at 1280.  For this

reason as well, Plaintiffs' claims for declaratory and injunctive relief against the Section 215

program lie outside the Article III jurisdiction of this Court.

> **B.      Plaintiffs Also Lack Standing to Seek Expungement of the Remaining
>          Bulk Telephony Metadata.**

In addition to declaratory and injunctive relief against further bulk collection or queries

of records about their telephone calls, Plaintiffs also demand that any records of their calls

collected under Section 215 be "expunged from federal government records."  *Klayman I* 4th

Am. Compl. ¶ 71; *Klayman II* 3d Am. Compl. ¶ 77.  As discussed supra, at 9, the Government no

longer retains the remaining metadata collected in bulk for its own purposes, but to comply with

preservation obligations in this and other litigation.  And with narrow exceptions addressed

below, *see infra*, at 30 n.12, it is required by the FISC's November 24, 2015, order to destroy all

bulk telephony metadata produced under the Section 215 program once its applicable obligations

to preserve the data for civil litigation purposes have been lifted.  Murphy Decl. ¶¶ 18; Nov. 24,

2015, FISC Order at 8.  Thus, Plaintiffs lack standing to seek expungement of those data because

the injury, if any, that they suffer from continued maintenance of the data is not fairly traceable

to the NSA's conduct, but to action taken by Plaintiffs themselves, and litigants in other cases.

The sole reason that the NSA continues to possess bulk telephony metadata collected

under Section 215 is the Government's duty to preserve potentially relevant evidence in the cases

at bar and in other still pending litigation in which parties maintain that the Section 215 program

violated their legal rights.  *See supra*, at 7.   "A party has a duty to preserve potentially relevant

evidence … once [that party] anticipates litigation," and if it fails to do so, it "runs the risk of

being justly accused of spoliation."  *Zhi Chen v. Dist. of Columbia*, 839 F. Supp. 2d 7, 12

(D.D.C. 2011). "The sanctions available for the destruction of documents or evidence with notice of their potential usefulness in litigation" are wide-ranging, including assessment of attorneys' fees, costs, or fines, preclusion of evidence or arguments, and, in severe circumstances, default judgment or dismissal. *See id.*; *see also Shepherd v. Am. Broad. Co.*, 62 F.3d 1469, 1478-79 (D.C. Cir. 1995); *Montgomery v. Risen*, -- F. Supp. 3d --, 2106 WL 3919809, at *17 (D.D.C. July 15, 2016). The Government's duty to preserve relevant evidence in this case and others challenging the Section 215 program arguably attaches to the bulk telephony metadata collected before the program was discontinued.

That is the case because the data, although classified and, as such, not properly discoverable, could in theory shed light on whether collection of records pertaining to the plaintiffs' calls has occurred, and to what extent. Hence, the data arguably are relevant here and in other cases to the plaintiffs' standing, and to an assessment of claimed damages. No doubt for these reasons, Plaintiffs here have provided express notice that they desire preservation of the bulk metadata for purposes of these cases; the proposed order submitted with their renewed motion for a preliminary injunction requested that the Government Defendants be prohibited from "destroy[ing] any records relating to the Plaintiffs until this case is tried and all appeals are heard." *Klayman I*, [Proposed] Order, ECF No. 149-3. To the same effect, the preservation orders in *Jewel*, *Shubert*, and *First Unitarian* all reiterate the parties' "duty to preserve evidence that may be relevant to [these] action[s]," and direct the parties to halt the destruction and arrange for the preservation of any such materials. *Jewel* Preservation Order ¶¶ A, D; *Shubert* Preservation Order ¶¶ A, D; *First Unitarian* Preservation Order ¶¶ A, E. Although no such orders have been entered in the other still-pending cases challenging the NSA's Section 215 program, a duty to preserve potentially relevant evidence attaches in those cases as well.

The Government maintains that the claims for declaratory, injunctive, and other equitable relief in all of these cases are moot, but they remain in litigation, and several of the cases, *Jewel*, *Shubert*, *First Unitarian*, and those here at bar, involve claims for damages that survive the termination of the Section 215 program.[11]  Therefore, the duty arguably imposed on the Government by the pendency of these cases to preserve bulk data collected prior to the termination of the Section 215 program still persists.

Thus, even assuming hypothetically that any of the Plaintiffs suffer injury due to the NSA's mere possession of the bulk telephony metadata—a question the Court need not reach—they would still lack standing to litigate their expungement claims against the Government Defendants, because their alleged ongoing harm cannot now be attributed to the Government. To establish Article III standing, litigants must not only demonstrate injury (and redressability), but also that their injury is "'fairly trace[able] to the challenged action of [the defendants.]'" *Bhd. of Locomotive Eng'rs v. Surface Transp. Bd.*, 457 F.3d 24, 28 (D.C. Cir. 2006) (quoting *Defenders of Wildlife*, 504 U.S. at 560).  It is "well established," however, "that an injury one brings upon oneself is not a cognizable injury that has been caused by the defendant's conduct." *New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 2016 WL 4919871, at *20 (D.D.C. Sept. 14, 2016) (citing *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements of standing.")).  Where the injury complained of is "self-inflicted . . . the causal nexus needed to establish standing" is "sever[ed]." *Ellis v. C.I.R.*, 67 F. Supp. 3d

---

[11]  The Court's September 24, 2016, Memorandum Orders in *Klayman I* and *II* dismissed Plaintiffs' damages claims against the individual defendants for failure to effect service of process, *Klayman I* Mem. Op., ECF No. 175, at 1, 4; *Klayman II* Mem. Op., ECF No. 120, at 1-2, but those orders remain interlocutory until a final judgment is entered in the two cases, and may be appealed afterward.   *See* 28 U.S.C. § 1291; Fed. R. Civ. P. 54(b).  Moreover, Plaintiffs continue to assert constitutional tort claims for damages against the Government, under multiple "*Bivens*" theories.  *See infra*, at 38-40.

326, 336 (D.D.C. 2014) (citing *Grocery Mfrs. Ass'n. v. EPA*, 693 F.3d 169, 177 (D.C. Cir. 2012)

and *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989)).  *See also Afifi v.*

*Lynch*, 101 F. Supp. 3d 90, 108 (D.D.C. 2015); *Food & Water Watch, Inc. v. Vilsack*, 79 F.

Supp. 3d 174, 196 (D.D.C. 2015).

That is the situation here.  Any harm the Plaintiffs may assert based on the NSA's

continued maintenance of the remaining bulk telephony metadata would not be fairly traceable to

the current conduct of the Government Defendants, because Plaintiffs themselves have made it

unmistakably clear that so long as their claims remain to be fully and finally adjudicated, they

insist on continued compliance with the Government's duty to preserve the data, presumably as

evidence they consider supportive of their case.  Having "ma[de] [a] choice … in their own self-

interest," *Grocery Mfrs.*, 693 F.3d at 178, that obliges the Government Defendants to preserve

bulk data collected under the Section 215 program, Plaintiffs cannot now claim injury entitling

them to contest the Government's current possession of the data as unlawful.  *See also Petro-*

*Chem Processing*, 866 F.2d at 438.

Plaintiffs also lack standing to litigate their claims for expungement against the

Government Defendants because of the Government's separate obligations to preserve the data

for purposes of other pending litigation challenging the lawfulness of the Section 215 program.

An Article III court "may act only to redress injury 'that fairly can be traced to the challenged

action of the defendant, and not injury that results from the independent action of some third

part[ies] not before the court.'"  *Northwest Airlines, Inc. v. FAA*, 795 F.2d 195, 203-04 (D.C. Cir.

1986) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)); *see also*

*Grocery Mfrs.*, 693 F.3d at 176; *Nat'l Ass'n of Home Builders v. U.S. Fish & Wildlife Serv.*, 34

F. Supp. 3d 50, 59 (D.D.C. 2014).  The "unfettered choices" of absent third parties to pursue

their own legal challenges to the Section 215 program, thus arguably imposing on the

29

Government a continuing legal duty to preserve the remaining bulk data while those cases are pending, interpose an "independent variable" between Plaintiffs' asserted injury and the conduct of the NSA, "mak[ing] causation sufficiently tenuous that standing should be denied." *Palm v. Paige*, 161 F. Supp. 2d 26, 31-32 (D.D.C. 2001) (internal quotation marks and citation omitted).

It is true that while the Section 215 program was ongoing the NSA sought to collect and query bulk telephony metadata for its own purposes of gathering foreign-intelligence information. Since the termination of the program, however, that is no longer the case; and no dispute remains between Plaintiffs and the Government Defendants that the NSA should destroy the data once litigation over the Section 215 program is ended. Indeed, the FISC's November 24, 2015, order already requires the NSA to do so, and bars all but technical access to the data in the meantime.[12] The NSA's continued maintenance of the data now amounts to little more than a ministerial act; and the resulting harm to Plaintiffs, if any, is traceable to preservation-related obligations that they themselves, together with other litigants not before the Court, have imposed on the Government. *See Gordon v. Haas*, 828 F. Supp. 2d 13, 18-19 (D.D.C. 2011). Under these circumstances, Plaintiffs lack Article III standing to pursue their claims for expungement of the bulk telephony metadata.

---

[12] The only "narrow exceptions" to the FISC's order that the NSA destroy bulk metadata collected under Section 215 are: (1) information derived from the bulk metadata that has been previously disseminated in accordance with court-approved minimization procedures (*e.g.*, intelligence reporting on terror threats); (2) query results that form the basis of such disseminations; and (3) summary reports prepared by NSA technical personnel from data obtained during the technical access period. Nov. 24, 2015, FISC Order at 8; Murphy Decl. ¶ 18. Even assuming that records of any of the Plaintiffs' telephone calls are among the bulk data still retained, for now, by the NSA, it is speculative, at best, that once the bulk data are destroyed any information derived from records of Plaintiffs' calls will be maintained in any intelligence reporting on terrorist threats, query results on which such intelligence reports are based, or summary technical reports. Plaintiffs lack standing, therefore, to contest the continued retention of these narrow categories of information. *See Amnesty Int'l*, 133 S. Ct. at 1148-50.

III.    **PLAINTIFFS LACK STANDING TO SEEK DECLARATORY AND INJUNCTIVE RELIEF AGAINST THE DISCONTINUED BULK INTERNET-METADATA PROGRAM.**

Plaintiffs also demand a "cease and desist order to prohibit" the NSA from collecting or querying bulk Internet metadata pertaining to their online communications, and the "expunge[ment] from federal government records" of any such data that the NSA collected under FISA's pen-register and trap-and-trace provision. *See Klayman II*, 3d Am. Compl. ¶ 77. Plaintiffs lack standing to seek such prospective relief, for two reasons. First, the NSA ceased the FISC-authorized bulk collection of Internet metadata, and destroyed the accumulated metadata, in December 2011. Second, they cannot show that metadata pertaining to their communications was ever collected under this program, and thus they cannot establish injury.

The Constitution authorizes "federal courts to adjudicate only 'actual, ongoing controversies'"; they may not "decide questions that cannot affects the rights of litigants in the case." *NBC-USA Housing, Inc., Twenty-six v. Donovan*, 674 F.3d 869, 872 (D.C. Cir. 2012). 80 Accordingly, "[a] plaintiff who seeks prospective injunctive relief cannot establish standing based on past harm alone. . . . [T]he plaintiff must establish a real and immediate threat that the harm-producing conduct will recur." *Coal. For Mercury-Free Drugs*, 671 F.3d at 1279-80. Here, when Plaintiffs filed suit, the NSA's bulk collection of Internet metadata under FISA Section 402 had already been discontinued, some eighteen months earlier. *See* Murphy Decl. ¶¶ 19, 21. No operational program remained for a court to enjoin, no real and immediate threat of future injury to be avoided. *See Klayman*, 957 F. Supp. 2d at 8 n.6 ("no possible ongoing harm that could be remedied by injunctive relief" when the activity was "discontinued in 2011," well before suit was filed); *see also Lyons*, 461 U.S. at 102, 105-06 (plaintiff previously subjected to police chokehold did not have standing to seek injunction against chokehold policy where he could not show he likely would be subject to chokeholds authorized under the policy in

the future).[13]  And the prospect now that Plaintiffs will suffer future injury from bulk Internet

metadata collection has been made all the more unlikely by the enactment of the USA

FREEDOM Act, which prohibits bulk collection of metadata under authority of FISA's pen/trap

provision.  *See* USA FREEDOM Act, Pub. L. No. 114-23, § 201, 129 Stat. 268 (amending FISA

Section 402 to prevent its use to collect information in bulk); 50 U.S.C. § 1842(c)(3).

Plaintiffs' claim for expungement of bulk Internet metadata collected under Section 402

also presented no case or controversy at the time Plaintiffs filed suit.  In December 2011, about

one and one-half years before *Klayman II* was filed, the NSA destroyed its repositories of bulk

Internet metadata that had been collected under FISA Section 402.  *See* Murphy Decl. ¶ 21.  This

means that, even assuming metadata pertaining to Plaintiffs online communications had been

collected, the Court could offer them no relief on their expungement claim because no data

remained by then to "expunge[] from federal government records."[14]

In any event, even if the bulk Internet metadata program remained operational at the time

Plaintiffs filed suit, they still could not establish their standing.  Plaintiffs have presented no

---

[13]  This reasoning applies equally to claims for declaratory relief.  *See Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987) ("Although *Lyons* and its predecessors involved injunctive relief, whereas Haase seeks declaratory relief, we do not distinguish *Lyons* on this basis.  Lyons did not have standing because he failed to establish a sufficient likelihood of future injury. This conclusion, premised on the injury requirement of Article III, would not be affected by the *form* of relief requested.") (citation omitted)).

[14]  Plaintiffs are likely to argue in response that the "voluntary cessation" exception to the mootness doctrine applies here, as they have done before.  *See* Pls.' Opp. to Gov't Defs.' Partial Mot. to Dismiss, ECF No. 74, at 8-10; *see Klayman I* 4th Am. Compl. ¶ 45.  But the mootness doctrine and its exceptions only apply when the offending conduct was ongoing at the time the complaint was filed and then ceased during the litigation.  *See, e.g., Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 184 (2000) (noting that in contrast to *Lyons*, "Laidlaw's unlawful conduct . . . was occurring at the time the complaint was filed."); *see also United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 202-03 (1968) (holding case not moot under the voluntary cessation doctrine where the offending conduct allegedly ceased after the case was submitted to the district court).

meaningful allegations or evidence about the nature, scope, or scale of the bulk Internet metadata program—including which Internet service providers participated[15]—that would support the conclusion that metadata about Plaintiffs' online communications were ever collected. *See Klayman I* 4th Am. Compl. ¶ 46; *Klayman II* 3d Am. Compl. ¶¶ 1, 10. (While the Government has declassified the existence of this program, and acknowledged that it was a bulk program operated on a very large scale, the Government has not disclosed any details about its scope of operation or from which providers metadata were collected. *See* Murphy Decl. ¶ 20.) Rather, as with their allegations regarding the Section 215 program, Plaintiffs' contention that metadata about their online communications were collected "depends entirely on an inference from the existence of the bulk collection program itself," an inference too speculative to support standing. *See Klayman*, 800 F.3d at 565-66 (Williams, J.); *see id.* at 569 (Sentelle, J.). Thus, Plaintiffs' mere use of the Internet during the period of the program's operation does not establish that metadata about their communications were collected, and they have failed to show standing to pursue relief based on the NSA's past bulk collection of Internet metadata.

## IV.   PLAINTIFFS LACK STANDING TO CHALLENGE PRISM COLLECTION.

Plaintiffs also have not shown or even alleged facts sufficient to carry their burden of demonstrating that their electronic communications have been, or imminently will be, intercepted under PRISM. They also lack standing, therefore, to seek any relief against the conduct of this program.

---

[15] Plaintiffs sweepingly allege that "NSA, CIA, and the FBI siphoned personal data from the main computer servers of major U.S. Internet firms, including [nine different firms]." *Klayman II* 3d Am. Compl. ¶ 7; *see also id.* ¶ 2. They do not appear, however, to have the NSA's bulk Internet metadata program in mind, as this allegation includes the FBI and CIA as well as the NSA, and asserts that these agencies gathered far more than metadata (*e.g.*, "chat (video/voice), videos, photos, stored data"). *Id.* To the degree Plaintiffs are making an allegation about the bulk Internet metadata program, they are apparently combining it with allegations about other programs or purported programs; thus, these claims cannot be understood as an allegation about the nature or scope of the bulk Internet metadata program itself.

This Court has already said as much in the context of denying Plaintiffs a preliminary injunction.  *See Klayman*, 957 F. Supp. 2d at 8 n.6.  In that proceeding, Plaintiffs Klayman and Charles Strange asserted that they were users of online communications services offered by U.S.-based providers, *see Klayman II*, Pls.' Mot. for Prelim. Inj., ECF No. 10-2, Klayman Aff. ¶ 3; *id.*, ECF No. 10-3, Strange Aff. ¶ 3.  But neither their pleadings nor their supporting affidavits contained any assertions that the NSA actually had targeted communications of theirs in contravention of the plain terms of Section 702.  *See id.*; *see generally Klayman II* Am. Compl., ECF No. 30.  *See also* 50 U.S.C. § 1881a(b) (statutory proscriptions against targeting U.S. persons, or persons located in the United States); Murphy Decl. ¶¶ 22-23, 25.  Nor did their pleadings or affidavits show that communications of theirs have been or imminently will be acquired incidental to the authorized targeting under PRISM of non-U.S. persons located abroad. *See id.*  Rather, Plaintiffs simply speculated that their communications had been intercepted based on their level of political activism, *see, e.g.*, ECF No. 10-2, Klayman Aff. ¶¶ 4-8, 12.

The Court held that Plaintiffs' allegations and evidence were insufficient "to show that the NSA has targeted" or otherwise collected "any of their communications" under the Government's "targeted collection" program known as PRISM.  *Klayman*, 957 F. Supp. 2d at 8 n.6 (*citing Amnesty International*).  Noting that *Amnesty International* concerned the "same statutory provision" that authorizes the targeted PRISM collection, the Court ruled that Plaintiffs "lack[ed] standing, as squarely dictated by" *Amnesty International* where, as here, "it was speculative whether the government would seek to target, target, and actually acquire their communications." *Id.*

Plaintiffs have since added allegations to the operative *Klayman II* complaint in an attempt to cure this jurisdictional defect.  Plaintiffs Charles Strange and Mary Ann Strange, as well as Plaintiffs Ferrari and Garrison, now allege that they send and receive emails to and from

34

foreign countries.  *See Klayman II* 3d Am. Compl., ECF No. 106-1 ¶¶ 19-21.[16]  Plaintiff

Klayman further asserts that he sends emails to "individuals and high-ranking government

officials in Israel, a high-conflict area," where "U.S. and Israeli intelligence agencies are

constantly monitoring the telecommunications," *id.* ¶¶ 12, 13-15; and he also alleges that he has

communicated electronically with individuals in India, North Africa, and various European

countries with "very large Muslim populations" "where terrorist cells are located" and where

terrorist attacks have occurred.  *See id.* ¶ 17.  This means, according to Plaintiff Klayman, that

the NSA has "inevitably been monitoring [him] in the ordinary course of [its] surveillance" by

"undoubtedly target[ing his] domestic and foreign communications."  *Id.* ¶ 18.

      These additional allegations, even if presented in evidentiary declarations in opposition to

the Government's factual attack on jurisdiction, are not sufficient to show that Plaintiffs have

been targeted or imminently will be targeted under PRISM.  While Plaintiff Klayman has alleged

in a conclusory manner that the NSA has "undoubtedly" targeted him, he has offered no facts

(and nor can he) to support the bald assertion that the NSA targeted him under PRISM in

violation of the statutory prohibition against targeting U.S. persons.  *See* 50 U.S.C. 1881a(b)(1)-

(3); *Amnesty Int'l*, 133 S. Ct. at 1148; *see also* Murphy Decl. ¶¶ 22-23, 25.  None of the other

Plaintiffs alleges that he or she has been targeted under PRISM collection.  *See Klayman II* 3d

Am. Compl. ¶¶ 19-21.

      Nor do these additional allegations, even were they substantiated by evidence, establish

that Plaintiffs' electronic communications with individuals in foreign countries have been

incidentally collected, or imminently will be collected, because those foreign individuals were

"targets" under PRISM.  The Strange Plaintiffs, as well as Plaintiffs Ferrari and Garrison, make

---

[16] Plaintiff J.J. Little does not even allege that he (or his firm) engages in international
electronic communications.  *See Klayman II*, 3d Am. Compl. ¶ 22.

no effort in this regard at all; they claim only to communicate with unidentified persons in foreign countries who they do not allege are targets of PRISM collection. *See Klayman II* 3d Am. Compl. ¶¶ 19-21. And, while Plaintiff Klayman names certain individuals in Israel (for example) with whom he electronically communicates, references communications with "prominent human rights lawyers," and asserts that he communicates with persons in countries where terrorist cells are located, *id.* ¶¶ 13, 15, 17, Plaintiff Klayman does not assert, much less prove, that he actually communicates with PRISM targets either.

All of these factual assertions therefore fall short even of the factual predicate the Supreme Court rejected as insufficient to establish standing in *Amnesty International*. In that case, various human rights, labor, and media organizations asserted an "objectively reasonable likelihood" that their communications would be subject to Government surveillance because they communicated with persons who were "likely targets of surveillance." *Amnesty Int'l*, 133 S. Ct. at 1143, 1145. Specifically, the plaintiffs attested that they communicated with individuals "located in geographic areas that are a special focus of the Government's counterterrorism or diplomatic efforts" and with individuals they asserted the Government believed were "associated with terrorist organizations." *Id.* at 1145. The Supreme Court concluded, however, that the plaintiffs' evidence was insufficient to demonstrate standing, because it was "speculative whether the Government [would] imminently target communications to which [the plaintiffs] [we]re parties." *Id.* at 1148. Rather, the Court held that the plaintiffs' asserted injury rested on a "speculative chain of possibilities," including "[that] the Government [would] target the communications of non-U.S. persons with whom they communicate," that the Government would succeed in intercepting those communications, and that the plaintiffs would "be parties to the particular communications that the Government intercepts." *Id.* at 1148–50. This

"speculative chain of possibilities," *id.* at 1150, the Court found, did "not satisfy the requirement that [the] threatened injury must be certainly impending." *Id.* at 1148.

So too here.  The most Plaintiffs can do—and they have not even done that—is to speculate that the individuals in foreign countries with whom they communicate may be NSA targets under PRISM, the truth of which is, at any rate, classified.  *See* Murphy Decl. ¶ 27. Likewise, even if Plaintiffs could establish that their foreign-based non-U.S. correspondents were PRISM targets, they can only speculate that the Government would succeed in intercepting those targets' communications and that Plaintiffs would be parties to the communications that the Government successfully intercepted.  Accordingly, as this Court has already found, Plaintiffs "lack standing, as squarely dictated by" *Amnesty International*.  *See Klayman*, 957 F. Supp. 2d at 8 n.6.

Plaintiffs' allegations that PRISM "chills" their First Amendment rights of free speech and association cannot breathe jurisdictional life into their challenge against that program. Plaintiffs allege that PRISM "instill[s]" in them "fear that their personal and business conversations with other U.S. citizens and foreigners are in effect surveilled, tapped, and illegally surveyed." *Klayman II*, 3d Am. Compl. ¶ 63.  This, Plaintiffs allege, makes them "weary [sic] and fearful of contacting other persons and entities via . . . the Internet." *Id.* ¶ 64.

Given that Plaintiffs have not shown that their Internet communications have been or imminently will be subject to PRISM collection, their allegations of "chill" reflect only subjective fears on their part.  Such subjective fears are insufficient to establish a cognizable injury for purposes of standing.  *See Amnesty Int'l USA*, 133 S. Ct. at 1152 ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."); *Laird v. Tatum*, 408 U.S. 1, 10, 14 (1972) (holding that "[a]llegations of a subjective 'chill'" arising from plaintiffs' knowledge of the existence of "a

governmental investigative and data-gathering activity," without "any specific action of the [Government] against them," were "not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"); *United Presbyterian Church in the USA v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (chilling effect produced by unsubstantiated fear of surveillance is an insufficient basis for standing under *Laird*).[17]

## V.   PLAINTIFFS' CONSTITUTIONAL CLAIMS FOR DAMAGES AGAINST THE GOVERNMENT DEFENDANTS ARE BARRED BY SOVEREIGN IMMUNITY.

Finally, irrespective of Plaintiffs' ability to establish their standing, their claims against the Government Defendants for compensatory and punitive damages are barred by sovereign immunity.

"It is well established that 'absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.'" *Debrew v. Atwood*, 792 F.3d 118, 124 (D.C. Cir. 2015) (quoting *Meyer*, 510 U.S. at 475).  Thus, "the question of whether sovereign immunity exists 'is jurisdictional in nature,'" *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003) (citing *Meyer*, 510 U.S. at 475), and, "[a] party bringing suit against the United States bears the burden of proving that the government has unequivocally waived its immunity." *Id.*  "As the Supreme Court has often observed, waiver of sovereign immunity must

---

[17] The operative complaint in *Klayman II* also contains a vague reference to an alleged "government program" that Plaintiffs call "MUSCULAR," *Klayman II* 3d Am. Compl. ¶ 8 ("It has become known that through a government program entitled 'MUSCULAR,' the FBI, CIA, and NSA have been intercepting information of the entirety of American citizenry from Internet companies such as Google and Yahoo! as it travels over fiber optic cables from one data center to another.").  The complaint contains no non-conclusory allegations about this claimed program, and the Government has not confirmed or denied the existence of any such program.  This solitary allegation in a seventy-seven paragraph complaint is no more than a "naked assertion[] devoid of further factual enhancement," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), that is insufficient to confer subject matter jurisdiction. *See Amiri v. Gelman Mangmt. Co.*, 734 F. Supp. 2d 1, 2 (D.D.C. 2010) (applying *Iqbal* pleading requirement to Rule 12(b)(1) motion).

be 'unequivocally expressed in the statutory text,'" *id.* (quoting *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999)), and any "doubt or ambiguity" regarding the application of sovereign immunity must be "resolved in favor of immunity." *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 103 F. Supp. 3d 115, 118 (D.D.C. 2015).  If a plaintiff cannot establish that there is a waiver of sovereign immunity that is applicable to its claims, those claims must be dismissed for lack of jurisdiction.  *See id.*; *see also, e.g.*, *Smith v. EEOC*, --- F. Supp. 3d ---, 2016 WL 6078259, at *3 (D.D.C. Oct. 17, 2016).

Read literally, the complaints in *Klayman I* and *II* purport to assert "*Bivens*" claims not only against the individual defendants (now dismissed), but also against the Government Defendants, for alleged tortious violation of their constitutional rights under the First, Fourth, and Fifth Amendments.  *Klayman I* 4th Am. Compl. ¶¶ 49-69; *Klayman II* 3d Am. Compl. ¶¶ 55-75.  Yet Plaintiffs have identified no waiver of sovereign immunity permitting constitutional tort claims for money damages against the Government.  *See KIayman I* 4th Am. Compl. (generally); *KIayman II* 3d Am. Compl. (generally).  Indeed, the Supreme Court has held that there is "no waiver of sovereign immunity for damages claims for constitutional torts." *Coulibaly v. Kerry*, --- F. Supp. 3d. ---, 2016 WL 5674821, at *42 (D.D.C. Sept. 30, 2016) (citing *Meyer*, 510 U.S. at 477); *Lyles v. Hughes*, 83 F. Supp. 3d 315, 322 (D.D.C. 2015) ("[T]he United States simply has not rendered itself liable ... for constitutional tort claims") (quoting *Meyer*, 510 U.S. at 477). Rather, "[f]ederal constitutional claims for damages are cognizable only under *Bivens*, which runs against individual governmental officials personally." *See Loumiet v. United States*, 828 F.3d 935, 945 (D.C. Cir. 2016) (citing *Meyer*, 510 U.S. at 482, 485–86).

In the instant cases, as the Court has dismissed the claims against the individual defendants, *see* Mem. Order, *Klayman I*, ECF No. 175; Mem. Order, *Klayman II*, ECF No. 120, the only claims for damages that remain are those asserted against the Government Defendants

under the First, Fourth, and Fifth Amendments.  Because it is black letter law that sovereign

immunity bars such claims, the Plaintiffs' remaining damages claims must be dismissed for lack

of subject matter jurisdiction.

## CONCLUSION

For the reasons set forth above, Plaintiffs' claims in *Klayman I* and *Klayman II* should be

dismissed for lack of subject-matter jurisdiction.

Dated:  November 17, 2016

<div style="margin-left: 40%;">

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Branch Director

*/s/  James J. Gilligan*
JAMES J. GILLIGAN
Special Litigation Counsel

RODNEY PATTON
Senior Counsel

JULIA A. BERMAN
TIMOTHY A. JOHNSON
Trial Attorneys

U.S Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6102
Washington, D.C.  20044
Phone: (202) 514-3358
Fax: (202) 616-8470
james.gilligan@usdoj.gov

Counsel for the Government Defendants

</div>